Case number 15-2382, Jack Reese et al. v. CNH Industrial et al., argument not to exceed 15 minutes per side. Mr. Birchfield, you may proceed for the appellants. May it please the court, Bobby Birchfield for CNH Industrial America. I would like to reserve six minutes for rebuttal. On this third appeal, the court is relieved of the vesting issue with a fresh look at the contract. The canons of construction set forth in the Supreme Court's unanimous Tackett decision and in this court's Gallo decision require reversal and entry of judgment for CNH. The class here comprises persons who retired from CNH after July 1, 1994, but before April 1, 2005. Of the three main reasons the benefits are not vested, one is paramount. The benefits for all retirees in this class were renegotiated and granted anew in each successive CBA. This is CNH's primary argument and plaintiffs completely ignore it. When the 1990 agreement expired in 1995, the 1995 group benefit plan extended retiree health benefits to all persons who had retired after July 1, 1994. Similarly, when the 1995 contract expired in 1998, the 1998 contract did the very same thing. Thus, both the 1995 and 1998 contracts reached back, superseded the benefits provided under prior agreements, and granted new and different benefits to all persons who retired after quote, 7-1-94, unquote. Today... Counsel, this is Judge Sutton. I just had a question, a practical one. What are the stakes of the case at this point? They're very significant, Judge Sutton. Because this class consists of retirees, some of whom retired in their 50s, beginning in 1994 up through 2005, some of these retirees will be...CNH, if this judgment were affirmed, would be liable for benefits to these retirees for many, many years, decades into the future. The actuarial value of the benefits on CNH's books is quite substantial. Good. Well, as a follow-up, maybe just to make sure I'm understanding this, and maybe this is a question you can't answer, but if hypothetically you won on the tacket issue as opposed to the reasonableness issue, so if you won on the tacket issue, are you saying the company would just cut off all health care benefits for all these retirees? Your Honor, the company has, for the last many years, been trying to implement reasonable changes to bring these employees, these retirees, almost on to par, not quite on to par, with the more recent retirees. And that's what the company is intending to do. There is no current intention to eliminate the benefits, even if the court were to agree with us on tacket. But that prompts my first question, why then are the stakes so...I mean, I understand it's more expensive to do exactly what the plaintiffs want, but if you're already going to give them some healthy health care benefits, why would the stakes be that high? That's what I'm trying to figure out. The stakes are...even if we make these changes, the stakes are very high for the company. And given the exigencies of health care, which Your Honor is well aware of and wrote about in Reese too, the company should not be deemed contractually bound to keep the benefits the same as they were in 1998 forever. That's a contractual burden that the company believes is unfair and not required. Tacket relieves us of that burden. So, counsel, this is Judge Donald. I know the tacket decision instructed that lifetime benefits should not be...investing should not be inferred absent some durational language in the contract. But didn't...I mean, isn't there language in this contract which could really be construed to avoid the tacket language? Isn't there language in there that one could arguably say speaks or suggests durational language? Your Honor, I don't believe so. And in particular, as I was saying, the contract was...the benefits were renegotiated from agreement to agreement. Under Gallo, as the court said, there would be no reason to do so if the benefits were vested. In terms of durational language, there is no durational language, the plaintiffs have cited none, that suggests these benefits are accepted or excluded from the general durational clause of six years. Your...the durational issue is really where you hang your hat. If you started to consider extrinsic evidence, you don't really contend that it would support your claim, do you? Your Honor, we do believe that the language of the contract is unambiguous, and especially given that, as we argue, when the 95 contract expired, the benefits were re-upped, they were changed, and managed care was implemented in the 1998 contract. We contend that when the 98 contract expired, the benefits also expired, and the plaintiffs admitted in note to renegotiate the benefits at that point. As for the extrinsic evidence, Your Honor, the plaintiffs cite nine morsels of extrinsic evidence. Eight of those incidents of extrinsic evidence predate the pivotal 1995 contract, when the parties began to renegotiate the benefits. That has nothing to do with the 1998 contract. The only extrinsic evidence they cite to that is in the time period relevant are the benefit caps, which the plaintiffs admit were eliminated in the 1998 contract. So, having been eliminated, they also shed no light on the interpretation of the 1998 contract. Well, you just said some things about the extrinsic evidence, but that's not really, that was not really what you argued before this court, is it? Well, Your Honor, I believe we're being consistent. We argued that the extrinsic evidence should not be considered because there's no ambiguity in the contract, and because of the integration clause, and we've also argued that the extrinsic evidence, even if considered, should not be sufficient to impose vesting. If there's something in particular Your Honor would like to ask me about in our papers, or otherwise, I'm happy to try to answer it. I understand your position. Thank you. In addition to the reasons I've given before that the contracts were being renegotiated and re-upped cycle to cycle, and that the benefits were materially changed, as this court found in Reese 1, with the move to managed care, there are two other reasons why the benefits were not vested. The first and foremost reason, as stated in Gallo, is that there's no language that specifies the benefits were vested. The second is, as Judge Gibbons just noted, the durational clause, which applies unless there's an exception in the benefits to that durational clause, and there is no such exception here. Now to turn to the extrinsic evidence, the district court held that the contract was ambiguous because of the tying of pension benefits to health care benefits, and because of the lack of a specific durational clause on the health care benefits. Both Tackett and this court in Gallo held that those issues are not a basis for finding vesting. If they're not legally sufficient to find vesting, they are not legally sufficient to overcome CNH's summary judgment motion against vesting, and they're also not sufficient to create an ambiguity in the contract. The plaintiffs take a different tack. They argue that the decades-old war year of golf... I believe your time is up. That's what that ringing was. Oh, I see. Thank you, Your Honor. We've got a cell phone set with a stopwatch. Oh, well, I have one too, but I forgot to turn it on. Thank you, Your Honor. You're welcome. Good afternoon. May it please the court, Darcy Brault appearing on behalf of the appellee class of retirees. CNH promised lifetime retiree health care benefits to the class. It initially promised those benefits in the 1970s, and over decades and many collectively bargained contracts, the meaning of that contract language was reinforced, both by the party's conduct and their admissions. In 1998, the identical serially adopted language meant exactly what CNH historically and repeatedly said that it meant, that the class would receive retiree medical benefits for life. Now, CNH argues that the rigid adherence to the principles of historical meaning of the language in the contract, ignore the admissions of CNH regarding what the language means, ignore the decades of conduct that shaped the promises, ignore the law that shaped that conduct, and inform the meaning of those contracts, and to ignore any ambiguities inherent in that contract. And we disagree. Preference for a reading of the contract language that directly contradicts mountains of extrinsic evidence elevates form over substance in a manner that's not commanded or even condoned by the U.S. Supreme Court and Tackett. Counsel, this is Judge Sutton. What exactly is it that the contract obligates the company to do? I mean, if you were to just, you know, ideally you could pen it right down. What exactly would the contract language say that you're trying to enforce? How would you describe it? The employees retired on company pension and surviving spouses receiving company pension shall be eligible for health care benefits with no contribution. That is what we interpret to events and intent to vest those benefits because retirees will be retired on company pension until they die and surviving spouses will be receiving a company pension for their lifetime. Ms. Braw, I had a question for you. I'm sorry. Again? Judge Gibbons, did you have a question? No, no. I was just trying to let her know you had one. Oh, thank you. Yes. I did have a follow-up question. So, I guess you're doing a tying. You're saying, okay, if they retire, they're eligible for a pension. They're eligible for health care benefits. But when you describe the contractual obligation, you're not fixing it in time the way pensions are fixed. You want those health care benefits to grow just as the health care benefits for existing employees grow. Am I not right about that? Our position is that the contracts are to be read as a whole, considering the context, the custom, the practice supported by the record of evidence to determine what the intent of the parties is. Ms. Braw, you've got to let Judge Sutton interrupt you in trying to ask you a question. I think it's my phone. Okay. I think that you can't hear him. I know when I used to use phone conferences, when I was in the district court, there's a feature that is unfortunate that results in not being able to interrupt very well. Yes. I'll try it again. So, what I'm just trying to get at is, you know, just tell me yes or no, the contractual right you're trying to enforce, it really isn't like the pension right, because the pension right is fixed. That's what best thing means in the pension setting, whereas in the health care setting, you don't want the benefits fixed at 98 or the health care plan of 98. Yes, we do. You want your clients to be eligible for the improved health care benefits that existing employees got after that. Am I not right? You are not correct. Okay. So, you would accept, I mean, we'll hear from the other side, you would accept a health care plan and the cost of that health care plan frozen at the time the employee retired. I apologize, but I think that your question assumes that the benefits in the current plan are somehow fixed, and they are not fixed in the way that you're stating. The contractual obligation was for the benefits as they existed on the day of retirement. Those that are described in the current plan, the plan that they received the benefits in currently, and so those benefits have not changed. Now, I do want to mention, you mentioned the pension language being different, and in fact that's a distinguishing factor in our case compared to Gallo. We have exactly the same health care benefits and the pension benefits. But Tackett indicated that tying is one of the mistaken Yardman inferences we were told not to use. Well, you are not... Who cares about Gallo? I'm sorry? Who cares about Gallo when you have Tackett on that point? Well, tying is not... There's a difference between finding that tying is an indicator of vesting with an inference compared to looking at tying as an indication that the language may imply an intent and that that may make it an ambiguous... Looking at the whole contract, considering the context and the custom and practice of the parties, that there may be information about tying that informs that determination of ambiguity, which is, I think, what Justice Ginsburg said in her concurrence in Tackett. And I want to go directly to, because I think I'll run out of time otherwise, the importance of custom and practice in this setting, and I believe that the court can address the custom and practice without finding any ambiguity in the contract. In Tackett, the Supreme Court cited the Lincoln-Mills case and acknowledged that common rules of contract interpretation are to be applied only when they're consistent with federal labor policies. In Lincoln-Mills, the court held that Section 301 requires courts to fashion substantive federal common law for the interpretation and enforcement of labor contracts. And then, after that, the Steelworkers v. Warrior Gulf case was decided, and in that case, it described distinctly the fundamental differences between labor contracts and commercial ones, finding that the collective bargaining agreements cover the whole employment relation and call into being a new common law, and they call it the common law of a particular industry or a particular plant. The court then held that that ancestral common law, the practices of the industry and the plant, should be a part of the collective bargaining agreement, even though it's not expressed in it. In other words... What do we... Counsel, this is Judge Sutton. What do we do about the practice of not the industry but these parties of renegotiating the contracts and resetting the health care retiree benefits? Doesn't that... I mean, if we're going to pay attention to custom and practice, why isn't that the most relevant custom and practice as to these two parties? They seem to show by their actions and words that these were not lifetime commitments. Why else reset them? First of all, the answer is that all contracts, all collective bargaining agreements have durational pauses and are always renegotiated. The terms of each agreement are not, and the terms of each contract did not necessarily change. In fact, this language was in the negotiations and in the contract since 1971. But you shifted to managed care. That was the big change. Well, you know, there's an argument about that in the Reef II, of course, that the benefits were only modified to the extent that they improved those benefits for the retirees. And what vesting has meant, and it's always meant, is that the retirees can't receive reduced benefits. And there's no indication in the record that there were any reduced benefits. The only indication that those benefits were reduced came in the Reef II opinion in which this court indicated that the reduction, I guess, in options, which it supposed but was not based on the factual record, was the reduction in the benefits overall. However, the parties, and in the clear language of the contracts, talked about the benefits being vested. The case agreed to pay... But what do we do about the integration clause? I mean, if we do what the court said in Tackett of follow ordinary contract principles, you would pay attention to integration clauses. And we've got an integration clause. The integration clause just indicates that the agreement is to be... I don't think that any integration clause can delete the custom and practice of the parties. Here we have members of CNH's benefits department and officials repeatedly telling retirees that they had these benefits for life and that that's what that language meant. So when we get to the bargaining table, we have the very same language that's adopted again and again, which must mean that it's what they said it meant time and time again. Otherwise, they would have changed the language. Counsel, this is Judge Donald. In taking what you said about the language in the contract and how we should just construe that language, you started out by telling us what some of the language was. So under your theory, we don't have to ever get down to this reasonableness of the plan. We just look to the custom and practice and the language of the contract. Is that correct? That's correct. In terms of vesting, we need to look at the custom and practice. But you also said that the language in the contract has to be interpreted so that the retirees moving along in the continuum of the contract would always get more as benefits for the rank-and-file increase. They would get more. They just could never get less. So there's a floor, according to what you said. And the contract doesn't really say that. It just says benefits. So is there an inconsistency there? It may be confusing, my argument, with respect to the vesting and with respect to the reasonable modifications that were rejected by the district court in REIS-2, the proposed modifications, I should say. Obviously, the court accepted REIS-2 at face value and went through the analysis of the excuse me, that the proposed plan was not commensurate with the current plan on a number of different levels. Now, if the court finds that the benefits are vested, then the next part of Judge Duggan's decision is that the proposed modifications were not commensurate and were not what was anticipated by REIS-2, given that direction. In other words, the CNH had an opportunity to propose a moderate, mutually beneficial adjustment consistent with the court's allowance of a reasonably commensurate modification. And instead, they proposed a drastic one-sided change to the vested benefits, far in excess of the margins that this court granted. In fact, the total cost savings was nearly $200 million to them in imposing the proposed plan that they're suggesting. Counsel, this is Judge Sutton. I just want to make sure I understood your earlier answer, because maybe it related not to vesting but reasonableness. So Judge Donald said, is your theory of vesting that a floor was set either as a matter of practice or by the language of the CBA, and the company could never go below that floor in health care benefits, but it could and should go above that floor if health care benefits change for the company and its existing employees? Is that an accurate description of your theory of vesting? Our theory of vesting is that the agreement was for vested benefits, whether you get there by looking at the custom and practice, or if you get there by acknowledging... No, I'm asking about the floor. I'm asking about a floor. Is that an accurate way to characterize the contractual right that was vested, that, you couldn't go below, but you did have to go above if the health care plans changed for the company? Is that accurate or not? Just yes or no. It's a very simplistic, honestly, a simplistic view of what these benefits are. The current plan allows for changes in benefits. Also, the current plan... Is it simplistic? I'll grant that it's a simplistic characterization. What's the answer? I'm trying to... Is it simplistically wrong? I don't know if you're maybe not hearing me, but the answer is that the agreement for the benefits have a schedule of benefits, and they contain some flexibility in terms of what those benefits are. Also, the national and state health care initiatives allows for CNH to take advantage of governmental benefits that displace or replace the benefits that are provided. So what we're saying is that the benefits that vested are the benefits that were provided in the health care, in the group benefits plan on the day of retirement or as otherwise effective to them. But the modifications that occurred in 1995 and 1998 were an attempt to move from an indemnity plan, which was not a good plan, to a plan that provided a managed care, I guess you want to call it, system. Now, I will say that there was some transition period here in 1995 and 1998, and it bears some correction of the record because I know Mr. Birchfield in his brief talked about the cost of... Your time is up, and I think you've gotten kind of far afield from the question that Judge Sutton asked you. Do either of my colleagues have anything further? None for me. Okay. All right. We'll turn to Mr. Birchfield for his rebuttal time. Thank you, Your Honor. If time permits, I'd like to make five fairly discreet points. The first is that the plaintiffs have still not pointed to any language that guarantees besting of benefits. The closest they've come is pointing to the language that connects pension benefits to retirement benefits. That language is quoted at page 36 of our opening brief, and it simply says, Employees who retire under the Case Corporation Pension Plan after 7-1-94, or their surviving spouses eligible to receive a spouse's pension under the provisions of this plan, shall be eligible for the group benefits as described. No indication of the length or duration of those benefits. That does not prove vesting. Indeed, the Supreme Court in Tackett and this court in Gallo both indicated that the tying regime was not a sufficient basis to find vesting. Second point, on Warrior Golf, Warrior Golf was an arbitration decision. It had nothing to do with the vesting of retiree health benefits. And in fact, in that decision, the court talked about how certain types of evidence, including law of the shop, was often appropriate for arbitrators to consider, but not appropriate for courts to consider. We find Warrior Golf not helpful here. Third, the benefits, as this court has ruled now twice in Reese 1 and Reese 2, the benefits were in fact reduced, at least for some retirees, the court said, when the UAW and the company agreed to move to managed care in the 1998 agreement. So it was more than just renegotiating the benefits contract to contract, which as Gallo pointed out, undermines the vesting argument. It is also the reduction of the benefits from the 1995 agreement to the 1998 agreement that indicates the benefits were not lifetime guaranteed. Fourth point, extrinsic evidence. The extrinsic evidence is set forth in the plaintiff's brief at pages 26-29. As I indicated, there are nine tidbits of extrinsic evidence set forth there. All of them, all of them, except for one, relate to contracts before the 1995 contract. That's important because the reason there's a class that begins on July 1, 1994, is because that's when the spinoff that created the company now known as C&H Industrial America was created. And the labor agreements negotiated after that spinoff were different than the ones that were negotiated before. That is, the 1995 agreement and the 1998 agreement both re-upped the benefits, renegotiated the benefits. They did not just simply extend the benefits. They did not vest the benefits, if any of the earlier contracts did, at the time the retiree retired. Moreover, the only piece of evidence that the plaintiffs point to that is after 1995 is the cap language. I responded to that earlier, and I'm happy to answer any questions about it if there are any. Fifth point, quickly, on the reasonableness of the changes that C&H is advocating. Importantly, the UAW has now twice agreed, in 2005 and in 2010, to the exact same plan at a higher cost to the post-2005 retirees, post-class retirees, than C&H is attempting to implement here for this class. If those benefits are reasonable at the negotiating table, they're reasonable for this class. Second, Judge Duggan's view of the reasonably commensurate language, we believe, misinterprets what this court said. The court went to great lengths in Reese 2 to point out that you could not view health care benefits as roughly stable over the last several decades. The benefits increased, the court correctly noted, because of increases in technology and improving treatments. The 2008 CBO study, Congressional Budget Office study, which we cite in our brief, indicates that roughly half of those increases are due to better treatments and improving technologies. And that's roughly the same thing we're offering to charge the plaintiffs under the reasonable changes. We're asking them to pay 60% of the increased cost beginning the year this plan is implemented. They will always pay less than the post-2004 retirees. They will pay only 60% of the increased charges, and that's roughly commensurate with the improvements in their benefits. We think this plan is fair. We think this plan is at least equivalent to what they bargained for in 1998. It is better than what the UAW agreed to twice in 2005 and 2010, and it is way, way better than the benefits. The health care they will get because of the technological improvements is way, way better than they bargained for in 1998. I'll pause and see if there are any questions. This is Judge Sutton. I just want to make sure I'm grasping one point. Based on my earlier question to you, what would the company have done if it wanted to attack it? If I got it straight that you would still provide the same benefits to this class that you would provide if you lost and attacked it but won on the reasonableness point? Are they one and the same? Your Honor, the company's intention, I am told, is to implement the changes that they proposed since this case was remanded in 2009. The company has no current intention to eliminate the benefits, but a ruling for an under attack… I just want to make sure you're getting my question. I just want to ask whether the intended benefits you'd like to provide are the same as the ones you would provide if you lost and attacked it but won under reasonableness.  I believe so, Your Honor. Let me just restate it to make sure and correct me if I'm not getting it correctly. If you're asking if the company intends to do any more than implement the changes that they have proposed under the reasonableness standard of Reese one and two, the answer is the company has no intention to do more than that at this time. More or less. More or less. Okay, I got it. Thank you. My pleasure. If there are no further questions, your time is up, Mr. Birchfield. Thank you, Your Honor. Any further questions? We will consider the arguments that both of you have made carefully. We thank you for them.